IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| WALTER EDWARD HALL　　　　　　　　　* | |
| 　　　　Plaintiff, | |
| 　　v.　　　　　　　　　　　　　　　　* | CIVIL ACTION NO. DKC-06-2545 |
| CAPTAIN PHLONDA PEAY　　　　　　　* | |
| CHIEF TYRONE D. CROWDER | |
| FATHER CHARLES CANTERNA　　　　　* | |
| WARDEN LEHRMAN DOTSON | |
| SECRETARY MAY ANN SAAR　　　　　　* | |
| 　　　　Defendants. | |
| 　　　　　　　　　　　　　　　　　*** | |

## MEMORANDUM

I.   *Background*

On September 28, 2006, this court received for filing a 42 U.S.C. § 1983 prisoner civil rights complaint for declaratory and injunctive relief, along with compensatory and punitive damages, from John Walter Edward Hall ("Plaintiff"), an inmate confined at the Maryland Correctional Adjustment Center ("MCAC"). The exhaustive complaint contains a plethora of claims related to Plaintiff's custody levels, housing, and placement on special management meals or "food loaf" at MCAC in 2005 and 2006.[1]

II.   *Dispositive Filings*

On March 23, 2007, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.[2] Paper No. 16. On March 26, 2007, Plaintiff was notified that Defendants had filed a dispositive motion, that he was entitled to file materials in opposition, and that his failure to file responsive materials or to adequately rebut Defendants' documents could result in the entry of

---

[1]   Plaintiff takes issue with: (1) his continued assignment to disciplinary segregation; (2) the denial of higher levels in the Quality of Life Incentive Program; and (3) his placement on special management meals. Paper No. 1. He seemingly contends that Defendants' aforementioned actions (or inactions) were discriminatory and retaliatory in nature. *Id*.

[2]   Defendants submitted their dispositive motion exhibit list on March 26, 2007. Paper No. 18.

judgment against him and in favor of Defendants.[3]  Paper No. 17.  Despite notice, Plaintiff did not file an opposition.[4]  Defendants' pleading, construed as a Motion for Summary Judgment, may be determined without oral hearing.  *See* Local Rule 105.6. (D. Md. 2004).  For reasons to follow, the Motion for Summary Judgment is hereby granted.

III.    *Standard of Review*

Summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party.  *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998).  A party who bears the

---

[3]  This notice satisfies the requirements of *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir. 1975).

[4]  Prior to the filing of Defendants' dispositive motion and the issuance of the *Roseboro* letter, Plaintiff filed a letter questioning whether this court had received his motion to voluntary dismiss his case(s).  Paper No. 12.  This court informed Plaintiff that: (1) no such motion had been received for filing; (2) his case(s) remain active; and (3) he was responsible for filing any responsive pleadings.  Paper No. 19.  Notwithstanding this letter and the *Roseboro* notice, Plaintiff has not filed a response.

burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element...necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *See Anderson*, 477 U.S. at 256.

> In *Celotex,* the Supreme Court stated:
>
>> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324.  However, "'a mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D. N.C. 1966)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

IV.     *Analysis*

Pursuant to the Interstate Compact Agreement ("ICC"), on February 14, 2002, Plaintiff was transferred to the State of Washington.  Paper No. 16, Exs. 1 & 2.  In January of 2005, Plaintiff was returned to the Maryland Division of Correction and transferred to MCAC on disciplinary segregation after his ICC contract was terminated due to disciplinary problems in the Washington

Department of Corrections. Paper No. 16, Exs. 1 & 2. Defendants state that Plaintiff is to remain at MCAC until he receives another ICC assignment. *Id*.

In January of 2005, Plaintiff received an annual classification review. The classification team concluded that no change in security status was warranted and Plaintiff would remain at MCAC on maximum level II status. *Id*., Exs. 1-3. On February 11, 2005, MCAC staff developed a special behavior modification plan for Plaintiff that would: (1) suspend the balance of Plaintiff's disciplinary segregation sentence; (2) assign him to general population; and (3) place him on level #3 of the Quality of Life Incentive Program ("QOLIP")[5] pending another ICC negotiation and transfer. *Id*., Exs. 2, 4, & 6. Plaintiff agreed to the plan and understood that negative behavior would result in his return to disciplinary segregation. *Id*., Exs. 2, 4, & 6.

From February 24, to February 28, 2005, Plaintiff received two infractions for destruction of property and possession of contraband. *Id*., Ex. 7. The infractions were handled informally. Plaintiff remained on general population, but received a QOLIP sanction and seven days of cell restriction for both infractions. Paper No. 16, Ex. 7. On April 19, 2005, Plaintiff's QOLIP level

---

[5] The MCAC QOLIP was adopted in 2002. Its purpose was to: (1) create a safer environment for inmates and staff by reducing the incidence of assaults, uses of force, serious incidents, inmate weapons, and recidivism; (2) provide a behavior-driven, progressive incentive (level) system for the management of difficult inmates; and (3) positively reinforce appropriate inmate behaviors with education and programming (as staff and resources permit) as well as increasing property and privileges. *See* Division of Correction Directive ("DCD")100-166, issued August 5, 2002. The policy was developed in an attempt to "improve the behavior of...inmates with the use of a behavior-driven, progressive incentive system in conjunction with a discipline system." *Id*., § V. "Policy" The DCD discusses development of an individualized behavior management plan created by staff to target the particular disruptive patterns of each prisoner and to specify the sanctions to take place in response to the targeted behaviors. Among the sanctions contemplated are regression in the quality level assignment and temporary loss of privileges, including, but not limited to, recreation, use of a mattress during the day, television, radio, commissary, property, visits and the substitution of regular meals with a "special management meal," also known as food loaf. *Id*. Compliant behavior is rewarded with additional privileges, including outside recreation, more clothing, additional library privileges, more visitation, congregation with fellow prisoners, and fewer body restraints during recreation. The ultimate goal is to improve behavior so that a prisoner may return to a regular prison within the DOC. *Id*. As an inmate's QOLIP level is increased, so too is his comfort level.

was increased to level #4.  *Id*., Ex. 8.  On May 11, 2005, Plaintiff refused to lock in his cell after recreation and a matter of record was written.  *Id*., Ex. 9.  A two-day cell restriction was imposed as a QOLIP sanction.  *Id*., Ex. 9.  On July 22, 2005, Plaintiff received an infraction for breaking a light fixture.  *Id*., Ex. 10.  He agreed to pay for the light fixture, so the matter was handled informally.  *Id*., Exs. 1, 2, & 10.  On July 26, 2005, Plaintiff held his feed-up slot as an officer was attempting to close it.  *Id*., Ex. 11.  A QOLIP sanction of seven days cell restriction was imposed.  *Id*.

In August of 2005, the Psychology Department twice concluded that Plaintiff was mentally stable and there was nothing to preclude him from being transferred to an institution appropriate for his security level.  *Id*., Ex. 12.   On August 30, 2005, Plaintiff's QOLIP level was increased to level #5.  *Id*., Ex. 14.  On September 14, 2005, Plaintiff received an infraction for damaging a food tray.  *Id*., Ex. 15.  He received an informal disposition because he agreed to pay the $30.00 replacement cost of the food tray.  *Id*., Exs. 2 & 15.

October of 2005 represented a high water mark for negative and non-compliant behavior on the part of Plaintiff.  On October 11, 2005, he received 3 notices of infraction for threatening staff and spitting on one of the officers, for which he was sanctioned with 150 days of disciplinary segregation.  *Id*., Exs. 2 & 16.  The following day, a medical cell restriction was placed on Plaintiff for refusing to submit to a tuberculosis test.  *Id*., Ex. 17.   On October 20, 2005, Plaintiff received an infraction and was sanctioned with an additional 150 days of disciplinary segregation after a piece of metal was found hidden in a rolled-up pair of socks under his bunk.  *Id*., Exs. 2 & 18.  On October 25, 2005, he received two notices of infraction for dismantling the intercom system in his cell, for which he was sanctioned with an additional 60 days of disciplinary segregation.  *Id*., Exs.

2 & 19. As a result, Plaintiff's QOLIP level was decreased to level # 1 on October 28, 2005. *Id.*, Ex. 20.

On November 7, 2005, Plaintiff's QOLIP level was increased to level #2. Paper No. 16, Ex. 21. Disciplinary segregation reviews were conducted on November 10 and December 6, 2005, and it was decided that Plaintiff would remain on disciplinary segregation. *Id.*, Exs. 22 & 23. On December 21, 2005, Plaintiff received 7 days of cell restriction as a QOLIP sanction for masturbating. *Id.*, Ex. 24. On January 3, 2006, another disciplinary segregation review occurred, and it was recommended that Plaintiff remain assigned to disciplinary segregation. *Id.*, Exs. 2 & 25. On January 31, 2006, the segregation review team recommended that 30 days of Plaintiff's disciplinary segregation be suspended and he be allowed one special visit. The MCAC Warden disapproved the recommendation because Plaintiff had made threats against staff. *Id.*, Exs. 2 & 26.

Plaintiff's annual review, conducted on January 27, 2006, resulted in a decision to continue his housing at MCAC maximum security level II. *Id.*, Exs. 2 & 27. On February 1, 2006, Plaintiff received 2 notices of infraction for threatening staff and spraying urine on them, for which he received another 150 days of disciplinary segregation and an indefinite suspension of visits. *Id.*, Exs. 2 & 28. On February 2, 2006, he was placed on a special management meal for two weeks,[6] while maintaining Level #1 in the QOLIP. *Id.*, Ex. 29. On February 3, 2006, Plaintiff was transferred to the Correctional Mental Health Center in Jessup, only to be returned to MCAC on February 9, 2006. *Id.*, Ex. 2.

On February 14 and February 19, 2006, Plaintiff received infractions for destruction of property, which were handled informally. *Id.*, Ex. 2. Plaintiff received a reprimand and it was agreed he would pay restitution. *Id.* On February 21, 2006, it was decided that Plaintiff would

---

[6] Both medical and mental health care staff found no reason to terminate Plaintiff's placement on food loaf. Paper No. 16, Ex. 29.

remain at Level #1 for at least 30 days. *Id.*, Ex. 30. At a disciplinary segregation review conducted on February 28, 2006, it was decided that Plaintiff would remain on MCAC disciplinary segregation, but his QOLIP level would be increased to Level #2. Paper No. 16, Exs. 2, 31, & 32. Subsequent reviews conducted in March and April of 2006, reached similar decisions. *Id.*, Exs. 2, 33, & 34. On May 16, 2006, however, Plaintiff's QOLIP level was decreased to Level #1 for masturbating. *Id.*, Ex. 35. On May 27 and May 30, 2006, Plaintiff was cited with infractions for destruction of state property. *Id.*, Ex. 2. The first infraction resulted in a reprimand, as Plaintiff agreed to pay for the light fixture. *Id*. The later infraction was dismissed. *Id*. Ex. 36. On June 14, 2006, Plaintiff flooded the tier. *Id.*, Ex. 37. As a result, he remained at QOLIP Level #1 for the following month. *Id.*, Exs. 37 & 38. On July 11, 2006, Plaintiff's QOLIP status was increased to Level #2. *Id.*, Ex. 39.

On August 22, 2006, staff decided to allow plaintiff one special visit as part of his program evaluation. *Id.*, Exs. 2 & 40. On October 10, 2006, Plaintiff's QOLIP status was increased to Level #3. *Id.*, Ex. 41. The decision to permit Plaintiff one special visit was recommended and approved again on December 8, 2006. *Id.*, Exs. 2 & 42.

In general, the Constitution does not entitle a prisoner to be held in any particular prison or classified to any particular security level. *See Montayne v. Haymes*, 427 U.S. 236, 243 (1976); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976); *Paoli v. Lally*, 812 F.2d 1489, 1493 (4th Cir. 1987). A liberty interest may, however, be created when state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).[7]

---

[7] Segregation is not per se cruel and unusual punishment. *See Allgood v. Morris*, 724 F.2d 1098, 1101 (4th Cir. 1984) (segregated protective custody); *Ross v. Reed*, 719 F.2d 689, 697 (4th Cir. 1983) (administrative segregation). Following the reasoning of the Supreme Court in *Sandin*, it appears that no liberty interest is implicated in placement on segregation. *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir.

The record shows that Plaintiff was sent to the State of Washington in 2002, as part of an ICC transfer, but was returned to Maryland within 3 years because of behavioral problems. Upon his return, a decision was made to house him at MCAC, pending a new ICC agreement with another state. He received annual reviews, along with periodic disciplinary segregation reviews. His behavior at MCAC during the course of 2005 and 2006 was not stellar. The record shows he committed numerous infractions and received over 500 days of segregation. Indeed, Plaintiff could have received additional segregation time but for the fact that the vast majority of infractions were informally disposed of by MCAC staff.

Given the circumstances behind this transfer, the court finds no due process violation in plaintiff's housing on MCAC disciplinary segregation. It is not "atypical" for inmates to be placed on segregation or to be housed at a particular prison for any number of reasons. Moreover, the weakness of Plaintiff's due process claim is that he has not demonstrated that the conditions of his assignment to MCAC were significantly more onerous than that at any other maximum security facility or at the Washington State facility where he was previously housed. *See Beverati,* 120 F.3d at 504 (conditions of administrative segregation at Maryland Penitentiary); *Knox v. Lanham*, 895

---

1997); *Reffitt v. Nixon*, 917 F. Supp. 409, 413 (E.D. Va. 1996).

F. Supp. 750, 758-59 (D. Md. 1995) (administrative segregation at Eastern Correctional Institution).[8]

It is not clear whether Plaintiff is raising a general conditions of confinement claim regarding his placement on segregation and the QOLIP at MCAC and the limitations which ensue from such an assignment. He does appear to challenge the decision to put him on special management meals.

A prisoner may set out an Eighth Amendment conditions of confinement claim by alleging that he was deprived of an objectively serious basic human need and that subjectively, prison officials acted with a sufficiently culpable state of mind to expose him to those conditions. *See Strickler v. Waters*, 989 F. 2d 1375, 1379 (4th Cir. 1993). Only extreme deprivations are adequate to satisfy the object component of an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U. S. 1, 9 (1992). Such deprivations may be demonstrated by producing evidence of a serious or significant physical injury resulting from the challenged conditions, *Strickler*, 989 F. 2d at 1380-81; *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997), or by demonstrating a substantial risk of serious harm resulting from the unwilling exposure to the challenged conditions. *See Helling v. McKinney*, 509 U.S. 25, 33-35 (1993). The key in determining whether prison conditions become cruel and unusual is to examine the effect on the prisoner. *See Rhodes v. Chapman*, 452 U.S. 337,

---

[8] *Patrick v. Corcoran*, Civil Action No. AMD-00-2258 (D. Md.), raised the question of whether a protected liberty interest was shown with regard to an administrative transfer to and continued confinement at MCAC. That civil rights case was stayed pending the resolution of parallel state court proceedings. On February 6, 2004, the Court of Special Appeals of Maryland issued an unreported opinion which found that no protected liberty interest was created in avoiding transfer and continued incarceration at MCAC. *See Patrick v. Secretary, Department of Public Safety and Correctional Services*, No. 2423, September Term, 2001 (Md. Ct. Spec. App., Feb. 6, 2004). In so finding, the appellate court evaluated Patrick's claims under *Sandin, Paoli*, *Meachum,* and *Beverati,* and concluded that there was nothing about the restrictive conditions at MCAC, in and of themselves, that would implicate a protected liberty interest, even if endured for the two-year period Patrick had been housed at MCAC. The Court of Special Appeals further noted that Patrick had failed to come forward with any evidence of the conditions of his former place of confinement (MHC-Annex), and thus did not show to what degree the conditions at MCAC imposed a "significant hardship" on Patrick in relation to the ordinary incidents of prison life. As a result of the appellate decision, a stipulation of voluntary dismissal was entered in *Patrick v. Corcoran*, Civil Action No. AMD-00-2258.

364 (1981). Plaintiff has failed to show that he was subjected to an extreme deprivation and that he suffered any injury resulting from his exposure to conditions at MCAC. The court therefore finds no Eighth Amendment deprivation as related to his conditions of confinement claims.

Finally, Plaintiff also raises claims of discrimination and retaliation about the QOLIP and his segregation assignment. He seemingly maintains that he has been subject to discrimination compared to the treatment and classification of other MCAC inmates in the program and that he has been placed on special management meals without reason and denied increases in his levels and removal from disciplinary segregation in "retaliation."[9]

Equal protection principles require generally that government officials behave in a way such "that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). To succeed on an equal protection claim, Plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also Washington v. Davis*, 426 U.S. 229, 239-42 (1976); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). The Equal Protection Clause is not violated when prison officials distinguish between prisoners based upon their institutional offenses or length of sentence when making decisions relating to access to programs and classification. *See Mahfouz v. Lockhart*, 826 F.2d 791, 794 (8th Cir. 1987).

There is no allegation here that decisions affecting Plaintiff's QOLIP levels, assignment to disciplinary segregation, and placement on food loaf were implemented in a manner that suggests discrimination by prison officials based on race, religion, or some other suspect classification. Indeed, the record plainly shows that the recommendations of MCAC staff regarding Plaintiff's

---

[9] Plaintiff also claims that Defendants retaliated by denying him a package containing a trimmer. Paper No. 1.

QOLIP levels, custody, and special management meals were directly linked to his numerous infractions. He fails to provide any evidence that he was treated differently than other QOLIP inmates with similar infraction histories.[10]

Further, while retaliation against an inmate for the exercise of a constitutional right states a claim under 42 U.S.C. § 1983, *see American Civ. Liberties Union v. Wicomico County*, 999 F. 2d 780, 784-86 (4th Cir. 1993), a plaintiff alleging retaliation "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial motivating fact in the prison officials' decision...." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Conclusory allegations of retaliation, unsupported by facts or evidence are not actionable. *See Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

Plaintiff claims that defendants conspired to retaliate against him with regard to his housing, QOLIP levels, special management meals, and receipt of a package. His naked assertions are insufficient to state a claim under § 1983. Further, such allegations are not supported by the record and declarations before the court.

IV.  Conclusion

For the aforementioned reasons, a separate Order will be entered granting Defendants' Motion for Summary Judgment and entering judgment in favor of Defendants and against Plaintiff.

Date:    May 17, 2007                         /s/
                                         DEBORAH K. CHASANOW
                                         United States District Judge

---

[10] In submitting verified declarations, Defendants Peay and Crowder deny discriminating or conspiring to retaliate against Plaintiff. Paper No. 16, Exs. 43 & 44.